James B. GOTTSTEIN, Appellant,

v.

Brian W. KRAFT and Serena Kraft, Wells Fargo Bank, N.A., Stewart Title Company, and Terrie G. Gottstein, Appellees.

No. S–14106.

Supreme Court of Alaska.

April 13, 2012.

---

Sarah J. Tugman, Anchorage, for Appellant James B. Gottstein. Chris D. Gronning, Bankston Gronning O'Hara, P.C., Anchorage, for Appellees Krafts.

Bruce A. Bookman, Bookman & Helm, LLP, Anchorage, for Appellee Terrie G. Gottstein.

Todd J. Timmermans, Hartig Rhodes Hoge & Lekisch, P.C., Anchorage, for Appellee Wells Fargo Bank, N.A.

Notice of non-participation filed by James M. Gorski, Hughes Gorski Seedorf Odsen & Tervooren, LLC, Anchorage, for Appellee Stewart Title Company.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

### OPINION

FABE, Justice.

## I. INTRODUCTION

This case concerns the ownership of James "Jim" and Terrie Gottstein's former marital home. Jim paid for the property, but Terrie's name alone was on the deed. The Gottsteins lived in the home for 15 years before moving out; they later separated. Terrie entered into a deal to sell the property to another couple, the Krafts, for significantly less than its appraised value, and Jim objected. One month before closing, Jim recorded a notice of interest under AS 34.15.010, which forbids a spouse from selling "the family home or homestead" without the consent of the other spouse. Neither the Krafts nor Terrie knew about the notice of interest, and the sale went ahead as planned.

Following the sale, Jim filed suit against the Krafts, requesting that the superior court recognize his ownership interest in the property. The superior court granted summary judgment in favor of the Krafts. It was undisputed that the property was not the Gottsteins' residence at the time of the sale and thus the superior court concluded that it was not "the family home or homestead," rendering Jim's notice of interest under AS 34.15.010 ineffectual. Jim appeals, arguing: (1) that the statute protected his interest in the property; (2) that the Krafts had constructive notice of his interest and therefore were not bona fide purchasers; and (3) that Jim has an equitable interest in the property and the superior court was mistaken in not granting his request for an equitable remedy.

We conclude that the phrase "the family home or homestead" in AS 34.15.010 refers to a family's residence. Because the disputed property was vacant, and the couple had moved to another home at the time of sale, it did not fall under the spousal consent requirement of AS 34.15.010(b). Jim thus did not put the Krafts on notice of any legally valid claim to the property. The superior court was correct in its assessment that Jim's equitable claims would be more appropriately raised in the context of the couple's divorce proceeding. We therefore affirm the superior court's grant of summary judgment to the Krafts, Terrie Gottstein, and Wells Fargo Bank.

## II. FACTS AND PROCEEDINGS

### A. Facts

Jim and Terrie Gottstein were married on October 10, 1982. Eight years later, in 1990, Jim used his separate funds to buy a large home on Lot 4 of the Alpine Woods subdivision in Anchorage. Terrie asked to be the sole grantee out of concern that Jim's involvement as an attorney representing clients in high-profile litigation might put the property at risk of potential lawsuits against Jim personally. Terrie was accordingly named as sole grantee. A few months after Jim and Terrie moved into the house on Lot

4, they acquired the neighboring Lot 5 in exchange for property owned by Jim.

Jim and Terrie set up reciprocal revocable trusts in 1995 as part of their estate planning process. The couple decided that in order for both trusts to contain a substantial amount of assets, the Alpine Woods property would be placed in Terrie's trust. Therefore, in 1999, Terrie conveyed Lot 4 to the Terrie G. Gottstein Revocable Trust. Jim conveyed his interests in Lot 5 to Terrie through a warranty deed, and Terrie conveyed Lot 5 to her trust. According to Terrie, each spouse maintained control of the property in their respective trusts. The terms of both trusts specified that the controlling spouse would have the power to "sell ... any and all real or personal property or interest therein ... in any manner ... for any purpose, upon any terms, credits and conditions, the trustee may deem desirable." The trust terms also stated that the trustee could "freely act under all or any of the powers by [the] agreement given to the trustee[ ] ... without the necessity of obtaining the consent or permission of any person interested therein." In 2007 Terrie amended her trust to change the successor trustee from Jim to a friend. Her amendment states that she did so because she wanted to ensure that the trust assets were preserved.

Terrie's trust bought a new family home on P Street in Anchorage in 2006. Jim, Terrie, and their children moved out of the Alpine Woods property and into the P Street home. In order to finance the purchase and remodel of the P Street residence, Terrie's trust took out a line of credit from Wells Fargo Bank secured by a deed of trust on the Alpine Woods property. Jim maintains that he verbally objected to Terrie using the Alpine Woods property as collateral, although Terrie disputes this. According to Jim, he wanted her to take out a traditional mortgage on the new home instead.

In order to pay off the loan, Terrie put the Alpine Woods property on the market in 2006. For the next two years, according to her affidavit, Terrie made efforts to sell the property. She met with ten real estate agents before settling on one, performed repairs and maintenance, hired a professional stager, and held open houses. The property was the subject of a feature article in the *Anchorage Daily News*. Nonetheless, despite reducing the price several times from its starting point of $1,399,000, Terrie received no offers for almost two years. Jim did not participate in the marketing process, and during this time Jim and Terrie separated. Jim moved to a triplex, Terrie stayed in the P Street home, and the Alpine Woods property remained vacant.

In July 2008 Terrie received an $800,000 offer from Brian and Serena Kraft, a married couple looking for a family home. A 2008 assessment valued Lot 4 at $1,000,000 and Lot 5 at $95,100. Needing to make payments to the bank on her loan, Terrie decided to accept the Krafts' offer. Jim's complaint states that he told Terrie the price was too low, that he owned "at least half" of the property, that he was "entitled to at least half" of the proceeds, and that he "would not join in a deed to convey the property for such a price."

On July 24, 2008, Jim signed and recorded a document entitled "Notice of Interest (AS 34.15.010(d)(2))." Alaska Statute 34.15.010 provides generally that a titleholder may convey land to another by deed, but if a titled spouse conveys "the family home or homestead," the other spouse must join in the deed. Alaska Statute 34.15.010(d)(2) requires that to preserve an interest in the family home or homestead, the untitled spouse must "record, within one year [of the conveyance] ... a notice of an interest in the property." Jim's notice of interest read (aside from a brief description of the property): "Pursuant to AS 34.15.010(d)(2), the undersigned ... hereby provides notice that he has an interest in [the Alpine Woods property]." Terrie's title company, Stewart Title, admitted during discovery that it did not disclose Jim's notice of interest to Terrie or to the Krafts.

Terrie emailed Jim two days later—without knowing of the notice of interest—to tell him that she was going to place the sale proceeds in a separate interest-bearing account and that Jim would not have to waive any claims regarding the sale. Jim did not respond. The sale closed on August 18 and

was recorded two days later. Terrie emailed Jim with the news on the day the sale closed and confirmed that she had placed the proceeds in a separate interest-bearing account. Jim responded in part:

> Congratulations on the house. I know it is a weight off of you. . . . I am fairly surprised that it closed without my participation, and as far as I can tell the buyers don't have good title. That makes me wonder about whether you agreed to indemnify the title company. Presumably it will all be sorted out as we go through the process.

On August 22 Jim sent Terrie another email with his notice of interest attached, suggesting she give a copy to her attorney. This was the first Terrie knew of the notice.

Jim also sent a letter to the Krafts with his notice of interest attached on September 11, 2008. The letter informed the Krafts of Jim's claim to own "at least half" of the property and again categorized his claim as one under AS 34.15.010. Perhaps not yet knowing that the property had been appraised in August, Jim asked for the Krafts' permission to have the property appraised. He wrote that if the property "isn't worth more than you paid for it, then I think the disposition of the proceeds will be determined in the divorce or dissolution." Jim concluded that unless he was wrong about his ownership interest or about the value of the property, he intended to file a lawsuit.

### B. Proceedings

Jim filed suit against the Krafts, Wells Fargo Bank, and Stewart Title Company on October 24, 2008. In his complaint, Jim sought a declaratory judgment that he owned the Alpine Woods property in fee simple and was entitled to possession. In the alternative, he claimed that he owned one-half of the property as a tenant in common with the Krafts and was entitled to half the proceeds from a forced sale.[1]

On June 19, 2009, Jim moved for summary judgment on the basis that he had "the right to recover" the property. He requested that

the deed of sale to the Krafts be declared "void and set aside." In the accompanying memorandum, Jim argued first that the conveyance to the Krafts was void under AS 34.15.010(b)-(d), and that the deed to the Krafts (and to Wells Fargo, their lender) was void because they had record notice of Jim's notice of interest and were not bona fide purchasers.

The Krafts filed an answer and a third-party complaint against Terrie on June 25, 2009. Terrie, in turn, filed a complaint against Stewart Title and against Jim. She filed a cross-motion for summary judgment against Jim on October 22, 2009, arguing that the Alpine Woods property did not fall under AS 34.15.010(b) because it was not the family home or homestead. Alternatively, she argued that even if the Alpine Woods property qualified as a family home or homestead, Jim had waived his homestead right by not objecting to the transfer of the property to Terrie's trust in 1999 within the statutorily required one-year period. The Krafts and Wells Fargo joined in Terrie's motion for summary judgment against Jim. The Krafts' memorandum incorporated Terrie's arguments and also maintained that the notice of interest was insufficient to provide the Krafts with notice of any interest in non-homestead property.

In his response to Terrie and the Krafts, Jim for the first time contended that he had a protected equitable interest in the property under the doctrines of constructive trust, resulting trust, and fraudulent conveyance, or according to general equitable principles.

Superior Court Judge Sen K. Tan granted summary judgment in favor of the Krafts, Terrie, and Wells Fargo on June 18, 2010. The superior court ruled that "[a]ccording to the undisputed facts," the property was not the Gottsteins' "family home or homestead" because it was not their residence at the time of sale. The superior court characterized the dispute as "whether AS 34.15.010 has been interpreted to protect an interest broader than 'the family home or homestead'" and

---

**1.** Jim also sought the rental value of the property from the closing date to the date of the court's verdict.

whether a spouse's interest in "marital property" is sufficient to assert a claim under the statute. The superior court concluded through an analysis of the statute and case law that only "the homestead and the family home [are] protected." The superior court also noted that Jim failed to object to the transfer to Terrie's trust in 1999 and that the trust unquestionably held title to the property. Finally, the superior court declined to enforce any equitable interest of Jim's. The superior court concluded that any constructive or resulting trust claims should have been pleaded against Terrie and not the Krafts and that they would be best resolved within the context of the Gottsteins' divorce case. The superior court also noted that Jim failed to raise questions of fact that would support a claim for fraudulent conveyance.

Jim filed a motion for reconsideration on the ground that the court was legally mistaken in ruling that Jim had no constructive trust action against the Krafts. In opposition to Jim's motion, Terrie, joined by the Krafts, maintained that Jim's equitable claims were properly pleaded against Terrie, not the Krafts, because there was no allegation that the Krafts obtained the property "by unjust, unconscionable, or unlawful means" as required for the operation of a constructive trust. The superior court denied Jim's motion for reconsideration for the reasons stated in Terrie's opposition. The superior court entered a final judgment against Jim on November 4, 2010, ruling that the Krafts, Wells Fargo, and Terrie (as fourth-party plaintiff) were entitled to costs and attorney's fees.[2]

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo, "draw[ing] all factual inferences in favor of, and view[ing] the facts in the light most favorable to, the party against whom summary judgment was granted."[3] "We will affirm a grant of summary judgment if there are no genuine issues of material fact and the prevailing party was entitled to judgment as a matter of law."[4]

Questions of law and questions of statutory interpretation are reviewed de novo, "adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[5] We will interpret the meaning of a statute such as AS 34.15.010 "according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[6]

## IV. DISCUSSION

### A. Alaska Statute 34.15.010 Did Not Grant Jim An Interest In The Alpine Woods Property.

Jim asserted his interest in the Alpine Woods property under AS 34.15.010. That statute provides that a conveyance of land can generally be made by deed "without any other act or ceremony whatever."[7] There is, however, an exception: "In a deed or conveyance of the family home or homestead by a married man or a married woman, the husband and wife shall join in the deed or conveyance."[8] The statute notes that the requirement that "a spouse . . . join in a deed or conveyance of the family home or homestead does not create a proprietary right, title, or interest in the spouse not otherwise vested in the spouse."[9] In other words, the joinder requirement does not give a non-

---

2. On November 4, 2010, all parties entered into a stipulation for dismissal without prejudice of the Krafts' third-party complaint against Terrie and Terrie's fourth-party complaint against Jim and Stewart Title Company.

3. *Interior Cabaret, Hotel, Rest. & Retailers Ass'n v. Fairbanks N. Star Borough*, 135 P.3d 1000, 1002 (Alaska 2006) (internal footnotes omitted).

4. *Cragle v. Gray*, 206 P.3d 446, 449 (Alaska 2009) (internal footnotes omitted).

5. *Kohlhaas v. State, Office of Lieutenant Governor*, 147 P.3d 714, 717 (Alaska 2006) (citing

*Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 991 (Alaska 2004)).

6. *Lot 04B & 5C, Block 83 Townsite v. Fairbanks N. Star Borough*, 208 P.3d 188, 191 (Alaska 2009) (internal footnotes omitted).

7. AS 34.15.010(a).

8. AS 34.15.010(b).

9. AS 34.15.010(c).

titled spouse "any interest" in the family home or homestead that the non-titled spouse "did not previously have." [10] Finally, the statute provides that if a titled spouse conveys the property without joining the non-titled spouse in the deed, the deed is nonetheless valid *unless,* within a year of conveyance, the non-titled spouse files a lawsuit or records a notice of interest in the property.[11] Jim filed his notice of interest under that final provision.

Under the terms of the statute, the only type of property to fall under the joinder requirement of section (b) is "the family home or homestead." Terrie and the Krafts maintain that "the family home or homestead" refers to a family's residence at the time of sale, and that the Alpine Woods property, having been vacant for some time, does not qualify. Jim contends that we should interpret the phrase to refer to all marital real estate, "at least in so far as the real estate in question is a home." It is undisputed that the Alpine Woods property was not the Gottsteins' residence at the time of sale and that it had been vacant since 2006.

We have not directly interpreted the terms "family home" and "homestead" in the context of AS 34.15.010, but we have noted that the statute's joinder requirement applies to "the property *used* as the family home," [12] implying that a family's use of a property determines its status as a family home or homestead.

The terms "family home" and "homestead" are generally defined in legal settings as a family's actual residence. Black's Law Dictionary defines "homestead" as "[t]he house, outbuildings, and adjoining land owned *and occupied* by a person or family as a residence." [13] "Family home" is defined as "[a] house that was purchased during marriage and that the family has resided in, esp[ecially] before a divorce." [14] Courts in other states have also defined a "homestead" as "where a family resides." [15]

Although there is little significant legislative history for AS 34.15.010,[16] Alaska had an "almost identical" statute before statehood.[17] In the case of *Spracher v. Spracher,* which applied that statute, the territorial court held that the "homestead right was created to protect the family from total loss of *its abode* due to judgments and executions on unsatisfied debts. It was not enacted, as it clearly states, to create any new right, title or interest other than the right of *occupancy* in property used as a homestead by members of the family." [18] That language suggests that statutory protection of the homestead was meant to protect a non-titled spouse from losing his or her residence due to unwise conveyances by the other spouse.

A provision for protection of the homestead elsewhere in Alaska law has a similar purpose. The Alaska Exemptions Act (AEA) includes a "homestead [tax] exemption" intended to "protect property that supplies the basic necessities of life." [19] That exemption

10. *Nat'l Bank of Alaska v. Ketzler,* 71 P.3d 333, 335 (Alaska 2003).

11. AS 34.15.010(d).

12. *Ketzler,* 71 P.3d at 335 (emphasis added).

13. Black's Law Dictionary 802 (9th ed. 2009) (emphasis added).

14. *Id.* at 680.

15. *Yeager v. Lucy,* 998 So.2d 460, 464 (Ala.2008) ("the home or house where a family resides, where the head of the family dwells, and any adjoining or appurtenant land used for the family's comfort and sustenance") (internal citations omitted); *see also Gowens v. Goss,* 561 So.2d 519, 521 (Ala.1990) ("actual place of residence") (internal citations omitted); *Snoddy v. Snoddy,* 791 So.2d 333, 341 (Miss.App.2001) ("actual oc-

cupation and use of the premises as a home for the family").

16. *See Ketzler,* 71 P.3d at 335 n. 6 ("Our search of the legislative history uncovered nothing that assists interpretation of the statute.... The statute as originally codified in § 22–3–1 ACLA 1949 consisted of one paragraph containing the provisions now codified as AS 34.15.010(a)-(b). The legislature amended the statute in 1953 to add the text now codified as AS 34.15.010(c)-(d).").

17. *Id.* at 336.

18. 17 Alaska 698, 705 (D.Alaska 1958) (emphasis added).

19. *In re Shell,* 295 B.R. 129, 134 (Bankr.D.Alaska 2003).

defines an individual's "homestead" as "the principal residence of the individual or the dependents of the individual." [20] "Principal residence" is in turn defined for the purpose of the AEA as "the actual dwelling place of an individual or dependents." [21]

Jim argues that there are "numerous definitions" of the concept of "homestead," but he does not cite a case or statute from any jurisdiction defining "homestead" as anything other than a family's actual residence. In light of accepted legal definitions of the family home and homestead, and considering the purpose underlying AS 34.15.010's predecessor statute and the AEA's homestead exemption, we conclude that the phrase "family home or homestead" refers to a home in which the family resides and does not apply to a vacant property. Because the Alpine Woods property was not the Gottsteins' residence at the time of sale, its conveyance does not fall under the joinder requirement of AS 34.15.010(b).

Jim asserts that he had a "marital property" interest in the Alpine Woods property that was sufficient to assert a claim under AS 34.15.010. But the assertion of such an independent interest is only relevant insofar as it occurs within one year of the conveyance of the family home or homestead.[22] We recognized in *Ketzler* that the requirements of AS 34.15.010 itself do not give a spouse "any interest in the property that the spouse did not previously have." [23] Alaska Statute 34.15.010 establishes a general rule that a property owner can transfer title and creates only one exception to that rule, for a spouse's transfer of the family home or homestead.[24] Because the Alpine Woods property did not fall within the statutory exception, Jim's assertion of an independent "marital property" interest under AS 34.15.010 is irrelevant.[25,26]

**20.** AS 09.38.010(a).

**21.** AS 09.38.500(12).

**22.** AS 34.15.010(b)-(d); *see also Ketzler,* 71 P.3d at 336.

**23.** 71 P.3d at 335.

**24.** AS 34.15.010(a)-(b).

**25.** We note also Jim's argument that "marital property" is an independent ownership interest under AS 34.15.010 is not supported by our decision in *Ketzler.* In *Ketzler,* we stated in dicta that " '[m]arital property' is not a species of ownership but it arguably represents a sufficient interest to receive protection under [AS 34.15.010]. This question is not presented in this case and we do not resolve it here." 71 P.3d at 336 n. 11. But we also noted that the property at issue in that case would only "be considered 'marital property' … *because a divorce was pending* and as such would be subject to division in the divorce even though held only in the name of the husband." *Id.* (emphasis added). No divorce was pending when Jim filed his notice nor when the sale closed. *Ketzler* did not suggest that a marital property interest could arise separately from a divorce action, let alone that such an interest would be protected under AS 34.15.010.

**26.** Jim also asks that we adopt the Uniform Marital Property Act's recognition of an ownership interest in marital property during the duration of a marriage. *See* Unif. Marital Prop. Act § 4 (amended 1998). We see no reason to judicially adopt that section of the UMPA and substantially modify Alaska's separate property system, wherein marital property exists only within the equitable distribution context of a divorce action. As the UMPA itself states, its creation of a *"present equal undivided interest for each spouse"* during marriage represents "a distinct departure from existing versions of 'marital property' arising out of equitable distribution developments in family law." Unif. Marital Prop. Act § 4 cmt. The Present Interest (amended 1998). The UMPA notes that "family-law interests set forth in marital property definitions in equitable distribution statutes are delayed-action in nature and come to maturity only during the dissolution process." *Id.* The Alaska legislature chose to create just such an equitable distribution system in AS 25.24.010. Equitable distribution during a divorce involves three steps: first, identifying the property as marital or separate; second, valuing the property; and third, allocating it between spouses according to equitable factors. *Wanberg v. Wanberg,* 664 P.2d 568, 570, 574 (Alaska 1983). Jim contends that recognizing marital property only at divorce could create an incentive for the titled spouse to sell property to avoid its distribution to the other spouse. Under equitable distribution, however, courts can and do take into account situations where one spouse has acted in bad faith. Alaska law instructs courts to consider "the conduct of the parties, including whether there has been unreasonable depletion of marital assets." AS 25.24.160(a)(2)(E); *see also Forshee v. Forshee,* 145 P.3d 492, 501 (Alaska 2006) ("A spouse who engage[d] in economic misconduct which has unreasonably depleted marital assets can be credited with the assets that he or she dissipat-

■ Jim argues that transferring the Alpine Woods property to Terrie's trust was "part of [the couple's] estate planning," and that he "did not then and does not now believe [it] divested him of his interest in the property." But the terms of the trust did divest Jim of his ownership interest, as they authorized Terrie to sell "any and all real ... property or interest therein ... in any manner, at any time ... for any purpose, upon any terms, credit and conditions, the trustee may deem desirable" without "obtaining the consent or permission of any person interested therein." To conclude that those terms were any less binding because the transfer was made for the purpose of "estate planning" would be contrary to public policy and common sense, as well as the plain language of the trust instrument.

■■ Jim also contends that the Krafts were not bona fide purchasers because they had notice of his alleged interest in the property. "It is a settled rule of property that circumstances ... [suggesting] outstanding equities in third parties[ ] impose a duty upon the purchaser to make a reasonable investigation into the existence of a claim."[27] But even if such circumstances exist, the buyer is only charged with "constructive notice of all the facts which he might have learned by means of a due and reasonable inquiry,"[28] and a recorded notice of interest gives the buyers constructive notice of "the contents of the document."[29] The Krafts therefore had constructive notice of the contents of Jim's notice of interest, as they admit. But they would only have learned that Jim asserted an interest under AS 34.15.010, which, as we conclude above, was ineffective. Even if the Krafts are tasked with the knowledge of all of the facts of this case, they were not on notice of any valid claim to the property.

## B. Jim's Equitable Claims Are Properly Determined In A Divorce Context.

■ Jim did not request an equitable remedy in his original complaint. In a reply brief filed with the superior court, however, he argued that even if AS 34.15.010 did not protect his interest, he had a "protectable equitable interest" in the Alpine Woods property. He suggested that the transfer to the Krafts could be set aside through one of a number of theories: constructive trust, resulting trust, fraudulent conveyance, or through "general equitable principles." The superior court declined to grant Jim an equitable remedy, and on appeal Jim argues that "[i]t was error for the trial court to refuse Jim such a necessary and proper remedy."

Jim contends that Terrie sold the property to the Krafts with "awareness that Jim did not agree" and "for significantly less than the property was worth." But Jim's complaint did not raise this claim against Terrie, and Jim has not explained how the Krafts themselves might have acted unjustly or in bad faith. Indeed, Jim refers to the Krafts as "third parties" in discussing his equitable claims.[30]

We agree with the superior court that whichever spouse is favored by the balance of equities, a divorce proceeding is the most appropriate setting to adjudicate the issue. The trial judge in the divorce case will be able to assess a number of factors in deciding whether to categorize the Alpine Woods property as marital or separate and in distributing the proceeds from the sale equitably.[31] If Jim maintains that the purchase

ed.") (internal quotation marks omitted). We decline to create a present spousal interest in marital property through judicial adoption of the UMPA.

27. *Modrok v. Marshall,* 523 P.2d 172, 174 (Alaska 1974).

28. *Methonen v. Stone,* 941 P.2d 1248, 1252 n. 5 (Alaska 1997) (quoting *Petrain v. Kiernan,* 23 Or. 455, 32 P. 158, 159 (1893)).

29. AS 40.17.080(a).

30. *Cf. Modrok,* 523 P.2d at 175 ("If ... the quitclaim deed was obtained 'as a result of fraud and misrepresentation' on the part of [Modrok's] former wife, his claim must be against her and not against [the third-party buyers].") (internal citation omitted).

31. *Sparks v. Sparks,* 233 P.3d 1091, 1094 (Alaska 2010) ("The division of marital property requires that property first be characterized as marital or separate, then that the property be valued, and finally that it be distributed equally.") (citing *Odom v. Odom,* 141 P.3d 324, 330 (Alaska 2006)).

price was unreasonable, he can argue that an "unreasonable depletion of marital assets" took place.[32] It was therefore appropriate for the superior court to decline to adjudicate Jim's equitable claims in the context of his action against the Krafts.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's grant of summary judgment to the Krafts, Terrie Gottstein, and Wells Fargo Bank.

CHRISTEN, Justice, not participating.