WINFREE, Justice.
I. INTRODUCTION
A man died intestate after cohabiting for over 20 years with a woman. The decedent had named the woman as the sole beneficiary of his individual retirement account, but he did not provide for her to inherit any of his other assets. She sought a larger share of his estate, arguing that (1) the decedent had promised to support her financially if she moved to Alaska to live with him and (2) the court should divide the decedent's property according to their intent because they were domestic partners. A special master recommended rejecting her claims, and the superior court adopted the master's recommendation. Because we conclude that the superior court did not err in interpreting the scope of the parties' alleged contractual agreement or in rejecting the woman's domestic partnership claim, we affirm.
II. FACTS AND PROCEEDINGS
A. Facts
Jerry Hatten and Beverly Toland met in California in 1989. Hatten, who lived in Alaska, returned to California in 1992 and reconnected with Toland. According to Toland, Hatten asked her to leave her job, friends, and family behind to live with him in Kasilof. Hatten purportedly assured her that if she relocated "he would take care of [her]" and that she "wouldn't have to work." Toland agreed, and she moved into the house that she would occupy with Hatten for over 20 years.
Hatten was a commercial fisherman and paid for most of the couple's shared expenses. Toland worked at various jobs, first at a grocery store, then at a cannery, and later as a bartender. She also saw to domestic chores, such as cooking and cleaning. According to Toland, neither she nor Hatten had any other romantic partners, there was never any period of physical separation between them, and they shared a bed until the final years of Hatten's life, when he was experiencing discomfort from various ailments and opted to sleep on the couch.
*259 Neither Toland nor Hatten wanted to formally marry; each had previous marriages ending in divorce. Hatten's and Toland's financial and legal affairs consequently were less intertwined than their shared daily life. They had two joint credit cards, but they maintained separate checking accounts. Most significantly, Hatten exclusively owned the house they lived in.
Hatten built the house in 1978 and paid off the building loan shortly after Toland's arrival in Alaska. In 1998 he obtained a loan to purchase the leased land where he had built the house, and he subsequently paid off that loan around 2007. A 1998 appraisal valued the property at $ 190,800. Toland did not contribute to the loan payments nor was she listed on utility accounts, which Hatten paid. At no time did Hatten grant title to Toland. Hatten has two adult children from his previous marriage, a daughter and a son. Although Hatten's daughter had for some time lived outside his home, it remained a primary residence for his son, who is physically disabled.
Toland gave Hatten a will kit five years before his death. Hatten suffered from chronic obstructive pulmonary disorder, and when he battled pneumonia in January 2013 his friends and family asked how he planned to take care of his estate and urged him to create a will. In February Hatten named Toland the sole beneficiary of his $ 194,000 Edward Jones IRA account. The beneficiary designation form lists Toland's relationship to Hatten as "Domestic Partner." A month later Hatten suffered a heart attack and died. He left no will.
B. Proceedings
Toland filed a claim against the estate in September 2013, seeking, in relevant part, a "fair division of the value of the parties' [domestic partnership] assets ... taking into account [Hatten's] promise to take care of [her] for the rest of her life." The estate opposed her claim, requesting that it be denied in full and that Toland be required to vacate Hatten's residence.
A probate master conducted an evidentiary hearing to consider Toland's claims. The parties and witnesses offered conflicting testimony regarding the nature of Toland and Hatten's relationship. Some of the estate's witnesses described the relationship as one of convenience, not that of two romantic or life partners. They pointed to the fact that Hatten never claimed Toland as a dependent on his tax returns but once actually claimed her as a housekeeper. But Toland and others close to the pair described their relationship as that of a loving husband and wife, less the paperwork.
Testimony about Hatten's intentions regarding his property also conflicted. The estate's witnesses testified that Hatten was private about his financial affairs and never intended to give Toland the house. According to Hatten's daughter, her father said, "[h]is assets and his money and his things were none of our business," and when she asked if he had something in order Hatten replied, "don't worry, you and [your brother] will be fine, otherwise, it's none of your business."
Toland and other witnesses painted a very different picture of Hatten's intentions. Toland testified that Hatten told her "several times" he was going to make a will and "he wanted [her] to have [the] house" so that she could sell it, because it was too expensive and difficult for her to manage its upkeep alone. Toland stated that she had given Hatten a will kit, but she described him as a "procrastinator" when it came to paperwork. Toland had been unaware that Hatten had made her the sole beneficiary of his IRA; she testified that "[a]t one point, he told me that I was going to get 52% and his three grandsons were going to get the [rest] .... [A]ll of a sudden, he - he decided to change it. ... I didn't even know about it until after the fact." According to Toland, when she saw the paperwork and asked Hatten about it, he explained that his recent bout with pneumonia"opened his eyes that it was time for him to start taking care of things" and he was "going to get a will going."
Hatten's cousin recalled speaking with Hatten about a will "three or four times" as his health declined, and he had said, "I promise you that [Toland] will always have this roof over her head. This is her home." Another of Hatten's cousins testified Hatten said *260 that Toland was "going to be taken care of" and that he had "been seeing to it a little bit at a time." Finally, a neighbor who worked in real estate testified to a discussion she had with Hatten a month before he died, in which he both asked her for help with the IRA account and inquired about what he needed to do to get the house in Toland's name.
The probate master found that since "at least 1994," Hatten and Toland "lived together as a committed couple in [Hatten's] home." However, beyond the parties' general statements the master concluded that, "little is known about [Hatten's] specific intentions." The master found that, although Hatten made inquiries about transferring title of his house to Toland and received a will kit five years prior to his death, he "took no additional steps to transfer title, write down his intentions, or create a trust or will." Instead, approximately a month before his death, he named Toland a "100% beneficiary of his $ 194,000 Edward Jones IRA account."
The master concluded that Alaska's intestate succession laws do not contemplate the unmarried domestic partner. The master noted that the cases Toland cited "authorize courts to divide unmarried cohabitants' property according to the parties' intentions" upon separation but concluded that "[n]one provide direct authority regarding property division after death." The master concluded the "subjective intentions" of a decedent with respect to a cohabitant are subordinate to Alaska's statutes governing intestate succession.
The master also suspected that Alaska's statute of frauds does not permit enforcement of an oral lifetime support contract against an estate, but assumed to the contrary. The master stated that "Hatten's intentions, or the scope of the parties' contract, are hard to discern." The master noted that "Hatten's actions speak more loudly than his words." The master found it significant that "for more than 20 years, [Hatten] chose not to marry, create a will, establish a joint bank account, or put his house in [Toland's] name" but that when his health declined, he took affirmative steps to name Toland as his IRA beneficiary. Hatten's disabled son had lived in the house for decades; absent any evidence that Hatten wished to disinherit his children, this tipped the scales in favor of the inference that his not creating a will was intentional. The master concluded that Hatten intended to provide for Toland through the IRA and to leave the house for his children.
The superior court adopted the master's findings and conclusions of law and denied Toland's claim against the estate. Toland objected to the report and order. The court considered her objections in another written order and again concurred with the master's report. The court highlighted the master's finding that although Hatten was given every opportunity to leave Toland the house by will or deed he chose not to do so, opting to instead name her as the beneficiary of his IRA account.
Toland appeals. She argues that the court erred by denying her contract claim, that she and Hatten formed an enforceable lifetime support contract, and that the court's findings about Hatten's intent were clearly erroneous. She also asserts that the superior court erred by not recognizing her property rights arising from her domestic partnership with Hatten.
III. STANDARD OF REVIEW
We review the superior court's findings of fact for clear error, and we will reject a factual finding "only when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[1] "[W]hen a trial court's decision of a factual issue depends largely on conflicting oral testimony, the trial court's competence to judge credibility of witnesses provides even a stronger basis for deference by the reviewing court."[2]
"[W]e use our independent judgment for legal issues and review de novo the *261 court's interpretation of the law."[3] We apply our independent judgment to questions of statutory interpretation.[4]
IV. DISCUSSION
A. The Superior Court's Findings Of Fact Regarding Toland's Contract Claim Are Not Clearly Erroneous.
Toland contends that the testimony and record demonstrate the existence of a lifetime support contract between herself and Hatten and that under the contract's terms upon his death he intended for her to keep the house in addition to the IRA she received.[5] The master found that "Hatten's intentions, or the scope of the parties' contract, are hard to discern." The master ultimately concluded that the evidence did not show Hatten ever specifically promised or intended to give Toland the house as a means of fulfilling the purported support contract. The superior court adopted these findings in a May 2016 order. Toland asserts that the findings underlying the court's order are clearly erroneous, specifically that Hatten: (1) was guarded about his financial affairs; (2) made a variety of different statements to different people; (3) managed his finances competently; (4) actively chose not to make a will; and (5) knew that the house was in his name alone but took no affirmative steps to ensure Toland received it upon his death.
We conclude that neither the court's findings nor its ultimate determinations are clearly erroneous. Evidence in the record about Hatten's statements regarding his financial affairs suggests inconsistencies and that he was vague and guarded. Hatten's daughter testified that he stated his financial affairs were "none of [her] business" but that she and her brother would be fine. Hatten's sister testified that she had asked Hatten several times if he had a will, and he assured her, "[Y]es, don't worry about it, I've got it all taken care of." According to her, Hatten never indicated that he intended for Toland to keep the house. Hatten's son testified that his father "said he was going to end up selling [the house]."
Witnesses friendly to Toland testified that Hatten intended to financially provide for her, but none could specify what he ultimately decided. One testified that Hatten said Toland would have "this" particular roof over her head; another stated that Hatten had simply said he was taking care of things "a little bit at a time," and the witness "assumed" that Hatten had made a will; and a third testified that Hatten had inquired both about the IRA and "what he would have to do" to get the house in Toland's name after he died. Even Toland's testimony suggested Hatten's guardedness; for example, he changed his IRA beneficiary without her knowledge. The court's finding that Hatten was "somewhat private" about his financial affairs is not clearly erroneous.
Nor is the finding that Hatten managed his finances competently clearly erroneous. The record shows he cared financially for his property, named Toland as a beneficiary on his IRA, and maintained several bank accounts. Although Toland described Hatten as a "procrastinator," a finding that he managed his affairs "competently" and intentionally is not clearly erroneous.
The court's inference that Hatten actively chose not to make a will is also grounded in the evidence. Hatten was aware of the need to create a will. He knew his health was declining. Friends and family testified that *262 they had regularly raised the issue of creating a will with Hatten; Toland went so far as providing him a will kit. Hatten was as capable of creating a will as he was of naming Toland the beneficiary on his IRA account; he chose to do the latter but not the former.
We finally note that according to Toland's account of her agreement to move to Kasilof, Hatten did not specifically promise to give her title to his house at that time. Despite evidence that Toland worked throughout her relationship with Hatten, Toland testified that Hatten had promised "he would take care of [her]" and that she "wouldn't have to work." Although Toland testified that Hatten at one point told her that he wanted her to have his house, she also claimed that he had said she should sell the house because she would not be able to afford the expensive upkeep it required. Even in Toland's testimony, Hatten was not promising her a specific place to live, but an asset with which she could support herself. It was not error for the superior court to conclude that, assuming the existence of an enforceable lifetime support contract, Hatten fulfilled the contract by giving Toland his IRA account - roughly equivalent to the 1998 value of his property.
In sum, Toland did not show that the scope of the alleged lifetime support contract included giving her the house. Nor did Toland show that Hatten failed to live up to his alleged promise to care for her - he left her a substantial sum by naming her the sole beneficiary of his IRA. We conclude that the superior court's findings about Hatten's intent and the scope of the alleged contract are not clearly erroneous.
B. The Superior Court Did Not Err By Declining To Apply A Domestic Partnership Property Analysis To Divide Hatten's Property.
Toland also argues that the superior court erred by not applying a domestic partnership property analysis[6] and distributing Hatten's property based on Hatten's alleged intent. We conclude that the court was correct to distinguish domestic partnership property cases on the basis that those cases involved inter vivos separations.[7] We take this opportunity to clarify the relevant legal framework.
Alaska has distinct property division schemes that apply depending on when a relationship ends. If a marriage ends during the lifetimes of the spouses, courts apply statutory marital property principles and equitably distribute the spouses' property.[8] During the marriage, spouses do not gain a present property interest in marital property simply by virtue of their relationship; that interest vests only at divorce.[9] If a domestic partnership ends during the lifetimes of the partners, no specific statutes control the distribution of partnership property. This court instead has formulated a common law analysis to distribute the partnership property according to the partners' shared intent.[10] This partnership property interest, like a marital property interest, vests only at the dissolution of the partnership.[11]
If a relationship ends at the death of one member, Alaska's probate code comprehensively governs the rights of both surviving spouses and domestic partners.[12] A surviving spouse takes all, or most, of a *263 deceased spouse's intestate estate;[13] a surviving spouse who is dissatisfied with a deceased spouse's will can choose to receive a statutory elective share of the deceased's augmented estate.[14] A surviving domestic partner, in contrast, inherits none of a deceased partner's estate under the probate code. And, unlike in the case of an inter vivos separation, the probate code has provisions disposing of all of a deceased partner's estate, whether the partner died testate or intestate. There is no "gap" to fill with a common law scheme that would distribute the deceased partner's property according to the partners' shared intent. If the deceased partner did not provide for the surviving partner through a will, the surviving partner will not inherit the deceased's property as a testamentary matter.
Both surviving spouses and domestic partners can contest whether particular property is properly included in the deceased's estate. The probate code does not address this issue, and so we apply equitable and property law principles to determine ownership in the event of a dispute.[15] We have explicitly rejected the argument that "divorce-like marital property concepts and equitable distribution should apply in probate proceedings" to determine a surviving spouse's ownership of property.[16] Instead, for property that is titled in the name of one spouse alone, we apply a rebuttable title presumption.[17] The title presumption can be overcome by evidence of misconduct justifying the imposition of a constructive trust[18] or by evidence that the party not appearing on the title actually acquired an interest in the property.[19] In the case of real property, "th[e] presumption may not be overcome by mere surmise and conjecture."[20]
Applying this framework disposes of Toland's domestic partnership arguments. Because Toland and Hatten's relationship ended when Hatten died, Alaska's probate code, not a common law domestic partnership property division scheme, controls the distribution of Hatten's estate. Domestic partners are not among the heirs who inherit property from an intestate decedent.[21] Toland's claim thus must fail.
Toland argues that this court should follow the Washington Supreme Court's decision in Olver v. Fowler[22] and apply the same property division scheme to all domestic partnership separations regardless of when they occur. She contends that, consistent with Olver , this court should hold that domestic partnership property interests vest when the partners have the requisite intent. But Toland ignores a key distinguishing feature - Washington is a community property state, and spouses acquire "a present , undivided interest in the couple's community property."[23] Domestic partners in Washington acquire a similar interest "by analogy."[24] It follows then that, at the death of one partner in Washington, the surviving partner is entitled to retain the property interests properly acquired during the parties' lifetimes *264 - even if that property is titled in the deceased partner's name alone. In Alaska spouses and domestic partners do not gain a present property interest in separately titled property merely by virtue of their relationships.[25] Their interests vest only at an inter vivos separation.[26] If that separation never occurs during the spouses' or partners' lifetimes, the property interest never vests.
Toland also argues that this court should apply, "by analogy," Alaska's statutes governing the ownership of jointly acquired real property by married couples.[27] Even if we accept that a statute governing married couples should also apply to domestic partners, the statutes Toland cites are inapposite. They apply only to jointly acquired real property, and Toland has acknowledged that Hatten independently acquired and paid for his house and the land where it is located. And Toland has failed to rebut the presumption that Hatten is the owner of his separately titled real property. She has not proven that she acquired any interest in that property by contract, as described above, and she has not alleged that Hatten engaged in any misconduct justifying imposition of a constructive trust on his property.
V. CONCLUSION
The superior court's decision is AFFIRMED.

Dan v. Dan , 288 P.3d 480, 482 (Alaska 2012) (quoting In re Protective Proceedings of W.A. , 193 P.3d 743, 748 (Alaska 2008) ).

Dixon v. Dixon , 407 P.3d 453, 456-57 (Alaska 2017) (alteration in original) (quoting Vezey v. Green , 35 P.3d 14, 20 (Alaska 2001) ).

Riddell v. Edwards , 76 P.3d 847, 852 (Alaska 2003).

N. Slope Borough v. Brower , 215 P.3d 308, 311 (Alaska 2009).

Toland argues that the master erred by surmising that Alaska's case law and statute of frauds preclude enforcement of a lifetime support contract against an estate. But the master "assum[ed] for the sake of argument" that Toland's contract claim against Hatten's estate could be considered and proceeded accordingly. Finding no error with the court's interpretation of the alleged contract between Toland and Hatten, we decline to address her arguments regarding enforceability of lifetime support contracts in Alaska. And to the extent Toland argues Hatten orally promised or assured her after January 1, 1997 that he would give her the house or other property upon his death, we note AS 13.12.514(a) renders such oral agreements unenforceable. See Cragle v. Gray , 206 P.3d 446, 451 (Alaska 2009) (holding under AS 13.12.514(a) that "oral succession contracts that are not reduced to writing are unenforceable").

See Tomal v. Anderson , 426 P.3d 915, 922-24 (Alaska 2018) (setting out legal standards for domestic partnership property distribution).

See, e.g. , Tolan v. Kimball , 33 P.3d 1152, 1155 (Alaska 2001) (holding in dispute between unmarried cohabitants that "intent of the parties should control the distribution of property accumulated during the course of cohabitation").

Burts v. Burts , 266 P.3d 337, 342 (Alaska 2011) ("Alaska uses a statutory scheme of equitable division codified in AS 25.24.160(a)(4).").

See Kessler v. Kessler , 411 P.3d 616, 619 (Alaska 2018) ("The distinction between marital property and separate property is simply a way of categorizing property for purposes of division upon divorce, not a statement of property rights during marriage."); Gottstein v. Kraft , 274 P.3d 469, 476 n.26 (Alaska 2012) ("[M]arital property exists only within the equitable distribution context of a divorce action.").

See Tomal , 426 P.3d at 922-23.

Cf. Gottstein , 274 P.3d at 476 n.26.

See AS 13.06.005 -.16.705.

See AS 13.12.102.

See AS 13.12.202.

See Pestrikoff v. Hoff , 278 P.3d 281, 286 (Alaska 2012) (applying title presumption to determine ownership of property alleged to be included in deceased wife's estate).

Id.

See id.

See id.

See, e.g. , Sugg v. Morris , 392 P.2d 313, 316 (Alaska 1964) (holding that plaintiff failed to demonstrate her equitable interest in real property because she did not prove how much she had contributed toward down payment and mortgage payments).

See Pestrikoff , 278 P.3d at 284 (quoting St. Paul Church, Inc. v. Bd. of Trs. of the Alaska Missionary Conference of the United Methodist Church, Inc. , 145 P.3d 541, 554 (Alaska 2006) ).

See AS 13.12.102 -.103.

161 Wash.2d 655, 168 P.3d 348, 356 (2007) (en banc) (holding that jointly acquired property of deceased domestic partners should be divided according to their equitable interests in property).

Id. (emphasis added). "Community property" includes property acquired during the parties' relationship with community funds but titled in the name of only one spouse. See id.

Id.

See Gottstein v. Kraft , 274 P.3d 469, 476 n.26 (Alaska 2012).

See id. ; Kessler v. Kessler , 411 P.3d 616, 619 (Alaska 2018).

See Gottstein , 274 P.3d at 476 n.26.